IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 2000 Session

## STATE OF TENNESSEE  v. MICHELLE FERGUSON

**Direct Appeal from the Criminal Court for McMinn County**
**Nos. 97-386; 97-388; 97-389      Carroll L. Ross, Judge**

_____

**No. E1999-01302-CCA-R3-CD**
**August 3, 2000**
_____

Defendant Michelle Ferguson was convicted by a jury of two counts of aggravated child abuse and one count of first degree murder in perpetration of aggravated child abuse.  The trial court subsequently imposed concurrent sentences of eighteen years, eighteen years, and life.  Defendant challenges her convictions, raising the following issues: (1) whether the evidence was sufficient to support her convictions; (2) whether the trial court erred when it failed to sever the trials for the charges in this case; and (3) whether the trial court erred when it failed to grant a motion for a mistrial.  The judgment of the trial court is reversed, and the case is remanded for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, and ALAN E. GLENN, JJ., joined.

Julie A. Rice, Knoxville, Tennessee (on appeal); and Charles M. Corn, District Public Defender; and Thomas Edward Kimball, Assistant Public Defender, Cleveland, Tennessee (at trial) for the appellant, Michelle Ferguson.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussman, Assistant Attorney General; Jerry N. Estes, District Attorney General; and Richard Newman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I.  FACTS

Sheila Carroll testified that she was working at Athens Regional Medical Center on June 13, 1997.  At approximately 10:30 a.m., Carroll answered a telephone call from a woman who stated that she had found her three-year-old son at the bottom of the stairs and the child would not respond to anything.  Carroll instructed the woman to hang up the phone and call 911.  Approximately five to seven minutes later, Carroll saw the rescue crew bring a three year old boy into the emergency room.

Officer Terry Teague testified that at 10:38 a.m. on June 13, 1997, he received a call to respond to apartment 84 in the Lee Manor Apartments and he arrived at 10:42 a.m. When he arrived at the scene, Defendant "flagged [him] down" and began screaming. Defendant then led Teague upstairs to a bedroom where Sonchious Ferguson was lying on a bed with his brothers Tyler and Bradlee. Teague checked Sonchious' vital signs, and he observed that Sonchious had cold skin and glazed eyes. Teague observed that Sonchious had no pulse and no signs of breathing and "[t]here was no sign of life whatsoever." Teague also observed that Sonchious' hair, face, neck, and clothing were dry.

Officer Teague testified that he asked Defendant to accompany him downstairs so that the medical personnel could care for Sonchious. At this point, Defendant told Teague that while she was in the bedroom, Sonchious had started to go downstairs. Defendant stated that shortly thereafter, she heard a "boom, boom, boom, boom" and when she went to the stairwell, she observed Sonchious slumped over in a seated position. Defendant stated that she then picked up Sonchious, took him upstairs, put water on his face, and asked him what her name was. Defendant stated that Sonchious responded that her name was "Momma" and he stood for a moment, but he then rolled his eyes and collapsed. Defendant stated that she then called 911.

Officer Teague testified that when he went downstairs, he saw Austin Ferguson. Teague observed that Austin had a bruise on his forehead and a "pretty good size abrasion on his right cheek." When Teague mentioned the bruising, Defendant stated that Austin had been in a fight with an unknown child the previous day. Defendant then stated that she did not spank her children and she turned to her brother when the children need spanking. Defendant also stated that Sonchious had previously fallen down some stairs at her mother's house.

Detective Terry Bowers testified that he responded to the call from Defendant's apartment. Bowers discovered two plastic rods that could have been used to spank the children. Bowers also saw some water in the bathtub. Bowers subsequently went to the hospital and he observed that Sonchious had bruises all over his body from the top of his head to his feet. Bowers also observed that Austin had bruises on his head, neck, back, and shoulders.

Detective Don Long testified that when he responded to the call from Defendant's apartment, he was informed that Sonchious was dead. When Long asked Defendant some basic questions about what had happened, Defendant asked Long why he was accusing her. Long observed that Austin had a bruise over his right eye and when he asked Austin what had happened, Defendant stated that Austin had been in a fight. Long believed that the bruise was shaped like the sole of a shoe.

Detective Long testified that Defendant subsequently made a statement at the police station. Defendant stated that at approximately 9:45 a.m., she yelled at Sonchious because he had urinated on the floor of the hall. Defendant stated that she then spanked Sonchious with "a little black thing that is a piece of his toy ship." Defendant stated that shortly thereafter, she heard Sonchious walking downstairs and then she heard a "boom, boom, boom." Defendant stated that she knew that Sonchious had not fallen all of the way down the steps because if he had, he would have "snapped his neck." Defendant stated that she splashed some water on Sonchious' face and put him in the

shower to wake him up and when she asked him who she was and who he was, he was able to answer. Defendant stated that Sonchious subsequently became unresponsive, and she called 911. Defendant claimed that she did not spank her children and instead, she called her brother and he spanked them with his hand or a belt. Defendant claimed that the bruises on Sonchious' head came from the fall down the stairs and the other bruises, knots, and skin injuries occurred while he was staying with Defendant's mother.

Paramedic Robert West testified that he responded to the call from Defendant's apartment. When West checked Sonchious, he observed that Sonchious' skin was cool to the touch, which is usually a sign that the person has not been breathing for quite a while. West did not observe any dampness or wetness on Sonchious. When West subsequently attempted to intubate Sonchious, he observed that there was a dark brown liquid on the throat tube, which is a sign of internal bleeding. West also observed that Sonchious had bruises on his abdomen.

Paramedic Jeff Layman testified that when he arrived at Defendant's apartment, he did not observe any wetness on Sonchious. Layman observed that Sonchious' skin was cool, which usually means that the person has been dead for "quite a period of time."

Paramedic Kevin Womac testified that when he checked Sonchious, he discovered that the skin was cool, there was no pulse, and there was no sign of wetness. Womac observed that Sonchious had extensive bruising on his abdomen and he also had some bruises on his neck, arms, and thighs.

Paramedic Stacey Newman testified that when she arrived at the scene, she observed that Austin "had a big goose egg swelled out between his eyes." Newman also observed that Austin appeared to be withdrawn or in a trance.

Karen Headrick of the Department of Children's Services testified that she was called to the Athens police station on June 13, 1997. Headrick met with Defendant and her children Austin and Tyler, and while Defendant was "[n]onchalant," Austin was nervous and worried and Tyler was fidgety and excited. Headrick observed a bruise on Austin's forehead that was shaped like a shoe print.

Dr. Kay Berg testified that on June 13, 1997, she was working in the emergency room where Sonchious was taken by the paramedics. Dr. Berg immediately noticed that Sonchious' body was "nowhere near as warm" as it should have been and she observed that the body was covered with bruises. Dr. Berg opined that although there were bruises of various ages, at least some of the bruises were more than two days old. Upon observing Sonchious, Dr. Berg concluded that he had been dead for at least an hour and any resuscitation efforts would be fruitless, so she called the medical examiner. Dr. Berg opined that Sonchious died from some kind of blunt trauma that was inconsistent with a one-time fall down stairs.

Dr. William Foree testified that as part of his duties as the McMinn County Medical Examiner, he was called to view Sonchious' body at approximately 11:20 a.m. Dr. Foree ordered

core temperature measurements to be taken for the next several hours and he requested an autopsy. Dr. Foree observed multiple bruises and abrasions on the body.

Dr. Ronald Toolsie testified that he performed an autopsy on the body of Sonchious on June 13, 1997. Based on core temperatures taken from the body, Dr. Toolsie opined that Sonchious had died at 5:00 a.m. on June 13, 1997.

Dr. Toolsie testified that during the autopsy, he discovered fifty separate injuries, including: linear abrasions under the jaw that were suggestive of fingernail scratches, a contusion on the neck that was between one and twenty-four hours old, a scar on the cheek that was at least several weeks old, an abrasion caused by blunt force trauma, an older loop mark scar, an older hook mark scar, a recent gliding abrasion on the abdomen, a recent contusion on the rib margin, another fresh contusion at the rib level, three fading contusions in the chest area that were consistent with blunt force trauma and were several days old, several fresh contusions on the back that could have been caused by a fall down some stairs, bruises on the undersurface of the scalp that were consistent with falling down stairs, a recent contusion by the ear that was consistent with a fall to the floor, and multiple whip marks on the back of the legs that were less than twelve hours old and were similar to judicial canings carried out by prison guards in far Eastern countries.

Dr. Toolsie testified that he discovered unusual bruises on the soft tissue of the abdomen that were consistent with inflicted blows. Dr. Toolsie's autopsy report states that he discovered "[e]xternal abdominal trauma consistent with multiple inflicted blows."

Dr. Toolsie testified that fresh blood poured out of the abdominal cavity when he cut into it, which indicated that Sonchious had been bleeding internally. Dr. Toolsie opined that the bleeding had come from the mesentery, which indicated that there had been blunt force trauma that intruded into the abdominal cavity. Dr. Toolsie also found bruises on the small intestine which were consistent with blunt force trauma that intruded into the abdominal cavity. Dr. Toolsie testified that it was "within the realms of possibility" that the internal injuries were caused by falling against the edge of a stair, but it was not "within the realms of probability" that falling against a stair caused the injuries. Dr. Toolsie opined that the internal bleeding occurred slowly over a period of time.

Dr. Toolsie testified that there were two causes of Sonchious' death: the internal abdominal bleeding and cerebral edema, or swelling of the brain. Dr. Toolsie testified that either of these injuries would have caused death by itself. Dr. Toolsie opined that in light of the autopsy evidence, Sonchious had died between 4:00 and 6:00 a.m. on June 13, 1997. Dr. Toolsie opined that Sonchious had been put to bed after he sustained the injuries, and the injuries progressed during the night until the point that they became lethal.

Tammy Buckner testified that on June 12, 1997, she lived in apartment 83 of the Lee Manor Apartments, which was right next to Defendant's apartment. At approximately midnight on that date, Buckner heard a noise similar to the sound of furniture moving and she also heard a short scream come from Defendant's apartment.

Kathy White testified that she was staying with Buckner on June 12, 1997. At approximately midnight on that date, White heard a noise like someone walking down steps and she also heard somebody scream.

Dr. Kimberly Breeden testified that she examined Austin on June 13, 1997. Dr. Breeden observed that Austin was "a sad, quiet little boy" and he was covered with bruises. Austin had significant swelling around his nose, which caused Dr. Breeden to suspect that the nose was broken. Subsequent x-rays confirmed that the nose was broken.

Dr. Breeden testified that during her examination, she discovered that Austin had numerous injuries, including: bruising and swelling on the forehead, linear line lesions that were consistent with a child being hit with a stick and were between two and seven days old, purple lesions on the face that were one to two days old, fresh and old lesions on the neck, healed injuries on the inner thigh, a laceration on the chest, old lesions on the arm, scaling abrasions on the back that were seven to fourteen days old, and fresh bruises on the shoulder. Dr. Breeden opined that the linear lesions on the face were consistent with being hit with the bottom of a shoe and were also consistent with being struck with the shoes found in Defendant's apartment. In addition, Dr. Breeden opined that the lesions on the neck were consistent with being choked by hands placed around the neck.

Dr. Breeden testified that it was her medical opinion that the markings on Austin's body were the result of brutal beatings. Dr. Breeden opined that there had been three different beatings because the purple lesions were less than forty-eight hours old, the brown bruises were seven to fourteen days old, and the healed lesions were more than fourteen days old.

Defendant testified that she woke up at approximately 9:45 a.m. on June 13, 1997. Tyler and Austin went downstairs to watch television, and Sonchious went into the hall and urinated on the floor. Defendant then spanked Sonchious and she changed his clothing. Defendant went back into the bedroom and she heard Sonchious fall down the stairs.

Defendant testified that she ran downstairs and saw Sonchious slumped over. Sonchious was able to respond to questioning, so Defendant carried him upstairs. At that point, Sonchious began "acting funny." Defendant then put Sonchious in the shower and she turned on the cold water because she had been told that cold water can prevent a person from becoming unconscious. Defendant subsequently took Sonchious out of the shower and changed his clothes. Sonchious was able to respond to more questioning, but when Defendant put Sonchious in bed his eyes "looked funny." Shortly thereafter, Defendant called 911.

Defendant testified that she and her children were the only people who had been in her apartment from June 11, 1997, until June 13, 1997.

Defendant testified that in regard to disciplining Sonchious, she yelled a lot. Defendant admitted that when Sonchious urinated on the floor on June 13, 1997, she spanked him with a black plastic rod. Defendant admitted that this whipping caused the marks on the back of Sonchious' legs that had been discovered by Dr. Toolsie. Defendant denied ever hitting Austin with a shoe, and she

testified that Austin had been beaten while playing at the playground on June 11, 1997. Defendant denied choking her children, and she believed that the marks on Austin's neck were sustained during the playground incident.

Defendant testified that her children came to live with her at the Lee Manor Apartments on May 22, 1997, and before that, they lived with Defendant's mother in Sweetwater. Around June 1, 1997, Defendant's children stayed with Defendant's mother and stepfather for the weekend. At that time, Sonchious was taken to the hospital because he had previously fallen down the stairs and had sustained a red knot on his head and a red spot on his eye.

Defendant testified that on one occasion while she was living in the Lee Manor Apartments, she called her brother to discipline the children and her brother came and spanked them. Before Defendant moved into the apartment, her family members would discipline the children. Defendant testified that although she bathed her children everyday, she did not particularly notice any bruises on Sonchious' body.

Defendant testified that Detectives Long and Bowers had lied during their testimony and "a whole bunch of lies" were brought out during the State's case in chief.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant contends that the evidence was legally insufficient to support her convictions for two counts of aggravated child abuse and one count of first degree murder in perpetration of aggravated child abuse. We disagree.

In this case, Defendant was convicted of the first degree murder of Sonchious Ferguson in perpetration of aggravated child abuse on or about June 13, 1997. Defendant was also convicted of the aggravated child abuse of Sonchious Ferguson between May 1, 1997, and June 13, 1997. In addition, Defendant was convicted of the aggravated child abuse of Austin Ferguson between May 1, 1997, and June 13, 1997.

Where the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979). In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this Court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this Court is required to afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Since a verdict of guilt removes the presumption of a defendant's innocence and replaces it with a presumption of guilt, the defendant has the burden of proof on the sufficiency of the evidence at the appellate level. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

At the time of the incidents in this case, Tennessee Code Annotated section 39-13-202 provided, in relevant part that "First degree murder is: [a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (1997). In addition, Tennessee Code Annotated section 39-15-401 provided, in relevant part:

> Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, that if the abused child is six (6) years of age or less, the penalty is a Class D felony.

Tenn. Code Ann. § 39-15-401(a) (1997).

Further, Tennessee Code Annotated section 39-15-402 provided, in relevant part: "A person commits the offense of aggravated child abuse and neglect who commits the offense of child abuse and neglect as defined in § 39-15-401 and: (1) The act of abuse or neglect results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a) (1997). Further, "[s]erious bodily injury" means bodily injury which involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Tenn. Code Ann. § 39-11-106(a)(34) (1997).

## A.

Defendant initially contends that the evidence was insufficient to support her conviction for the first degree murder of Sonchious in perpetration of aggravated child abuse. We conclude that when the evidence is viewed in the light most favorable to the State, as it must be, the evidence was sufficient for a rational jury to find beyond a reasonable doubt that Defendant killed Sonchious during the perpetration of aggravated child abuse.

Dr. Berg testified that when Sonchious was brought to the hospital, he was already dead and there was no question whatsoever that he had been severely beaten and abused. Dr. Berg also testified that the bruises on Sonchious' body were not consistent with a one- time fall down stairs.

Dr. Toolsie testified that during the autopsy, he discovered fifty separate injuries on Sonchious' body. Dr. Toolsie testified that he discovered unusual bruises on the soft tissue of the abdomen that were consistent with inflicted blows and his autopsy report states that he discovered "[e]xternal abdominal trauma consistent with multiple inflicted blows." Dr. Toolsie testified that fresh blood poured out of Sonchious' abdominal cavity when he cut into it, which indicated that Sonchious had been bleeding internally. Dr. Toolsie opined that the bleeding had come from the mesentery, which indicated that there had been blunt force trauma that intruded into the abdominal cavity. Dr. Toolsie also found bruises on the small intestine which were consistent with blunt force trauma that intruded into the abdominal cavity. In fact, Dr. Toolsie testified that the bleeding was

caused by "a very, very significant blunt force injury." Dr. Toolsie opined that the internal bleeding occurred slowly over a period of time. Dr. Toolsie testified that the internal abdominal bleeding was significant enough in and of itself to cause Sonchious' death.

Dr. Toolsie testified that Sonchious' internal injuries were similar to those he had seen in victims of car wrecks where there had been "an enormous impact." Dr. Toolsie stated that it was "within the realms of possibility" that the internal injuries were caused by falling against the edge of a stair, but it was not "within the realms of probability" that falling against a stair caused the injuries. Further, Dr. Toolsie stated that he did not observe the type of marks on Sonchious' belly that he would expect to see if the blunt force injury had been caused by falling against the edge of a stair.

Dr. Toolsie testified that it was impossible for Sonchious to have died when Defendant claimed he had. Dr. Toolsie testified that rather than dying around 9:45 a.m. as claimed by Defendant, Sonchious had died between 4:00 and 6:00 a.m. Dr. Toolsie opined that Sonchious had been put to bed after he sustained the injuries, and the injuries progressed during the night until the point that they became lethal. Numerous witnesses testified, contrary to Defendant's claim that she gave Sonchious a shower shortly before he died, that there was no indication of wetness on or around Sonchious' body.

Defendant testified that she and her children were the only people who had been in the apartment from June 11, 1997, until June 13, 1997.

A rational jury could conclude from the evidence that Sonchious' internal abdominal bleeding was caused by a "a very, very significant blunt force injury," that it was not within the realm of probability that the injury was caused by falling against a stair, that there were no marks on the belly that would have been expected if there had been a fall against a stair, that Sonchious' body had "[e]xternal abdominal trauma consistent with multiple inflicted blows", that Defendant was the only adult in the residence when the abdominal injury was sustained, that Defendant lied both before and during trial about the timing of Sonchious' death, and that Defendant knowingly inflicted the serious bodily injury on Sonchious that caused his death. Thus, the evidence was sufficient to support Defendant's conviction for the first degree murder of Sonchious in perpetration of aggravated child abuse.

**B.**

Defendant contends that the evidence was insufficient to support her conviction for the aggravated child abuse of Sonchious, alleged in count 3 of the indictment to have occurred between May 1, 1997 and June 13, 1997. We conclude that when the evidence is viewed in the light most favorable to the State, the evidence was sufficient for a rational jury to find beyond a reasonable doubt that Defendant knowingly treated Sonchious in a manner that resulted in serious bodily injury.

Although her time-sequence was inconsistent with other proof taken in the light most favorable to the State, Defendant did admit in her testimony that she spanked Sonchious' legs with a black plastic rod. Dr. Toolsie testified:

> Well, you know, the whip marks we saw on the back of [Sonchious'] legs were pretty severe. You know, they were associated with not only a lot of, lot of bruising at the whip marks but a lot of bruising around it as well, contusions. Like I mentioned earlier on, that—whippings or canings of this severity—this sort of injury that we see that, that occurs in the judicial canings in some of the far Eastern countries where it's actually carried out, you know, by prison guards, where there's this very particular type of injury where, that's pale in the center and dark red on the outside. That, as I indicated, requires a lot of force and is usually associated with bleeding not only into the underlying soft tissue, but also the underlying muscles.

Dr. Toolsie also testified that the leg injuries would have caused "[d]ysfunction over a period of one or two weeks."

A rational jury could certainly infer that the "judicial caning" with a plastic rod that "require[d] a lot of force" and was so painful that it would hinder the ability to walk for one or two weeks caused Sonchious to suffer extreme physical pain. See State v. Jim Inman, No. 03C03-9201-CR-00020, 1993 WL 483321, at *8 Campbell County (Tenn. Crim. App., Knoxville, Nov. 23, 1993), perm. to app. denied, (Tenn. April 4, 1994) (holding that the jury could infer from the circumstances that injuries resulted in extreme pain). Therefore, the whipping injuries qualify as serious bodily injury. See Tenn. Code Ann. § 39-11-106(a)(34)(C) (1997). Thus, the evidence was sufficient to support Defendant's conviction for the aggravated child abuse of Sonchious.

## C.

Defendant contends that the evidence was insufficient to support her conviction for the aggravated child abuse of Austin. We conclude that when the evidence is viewed in the light most favorable to the State, the evidence was sufficient for a rational jury to find beyond a reasonable doubt that Defendant knowingly treated Austin in a manner that resulted in serious bodily injury.

Detective Long testified that when he saw Austin on June 13, 1997, he observed that Austin had a bruise on his face. Long believed that the bruise looked like the sole of a shoe because it had "some striation or some lines running across almost vertically, to a slight angle, across the entire part of the face where the, where the bruise is showing, and also a definite outline back here as to an arch of some type." Dr. Breeden testified that when she saw Austin later that same day, she observed "purplish linear lesions" across the side of his face and over his eye. Dr. Breeden testified that these linear lesions were between twenty-four and forty-eight hours old and they "looked like the bottom of a shoe." In fact, Dr. Breeden testified that the linear lesions were consistent with the shoes that were found in Defendant's apartment. Dr. Breeden testified that for the blow with the shoe to have left the kind of marks it did, it would have to have been "[v]ery hard, very—." Further, Dr. Breeden testified that the injuries on Austin were the result of being "beaten brutally." Also, Dr. Breeden

testified that Austin's nose had significant swelling, and that x-rays confirmed that his nose was broken.

A rational jury could infer from the evidence that the liner lesions on Austin's face were consistent with the tread on the shoes found in Defendant's apartment, that the lesions were between twenty-four and forty-eight hours old, and that Defendant was the only adult who had been in the apartment for approximately the previous two days, and that Defendant was the person who struck Austin with a shoe and caused the lesions. A rational jury could also infer from the evidence that Austin was brutally beaten with a shoe with such great force that it left the imprint of the shoe's tread on his face that Austin suffered extreme pain. See Jim Inman, 1993 WL 483321, at *8. Therefore, the shoe-shaped lesions on Austin's face qualify as serious bodily injury. See Tenn. Code Ann. § 39-11-106(a)(34)(C) (1997). The broken nose meets the definition of obvious disfigurement and extreme physical pain. See Id. (a)(34)(D). Thus, the evidence was sufficient to support Defendant's conviction for the aggravated child abuse of Austin.

**D.**

Defendant also contends that the evidence was insufficient because the testimony of the State's witnesses was contradicted by the testimony of Defendant or other witnesses and because the State's witnesses failed to take all relevant facts into consideration when they estimated the time of Sonchious' death. However, "[t]he credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the triers of fact." State v. Cribbs, 967 S.W.2d 773, 793 (Tenn. 1998). We will not second guess the jury in the resolution of any conflicts in the proof or the determination of witnesses' credibility.

In this case, Defendant essentially asks us to reconsider the evidence and substitute a verdict of not guilty in place of the verdict found by the jury. That is not our function. Instead, we conclude that a rational jury could have found beyond a reasonable doubt that Defendant committed the three offenses for which she was convicted. See Tenn. R. App. P. 13(e). Defendant is not entitled to relief on this issue.

**III. SEVERANCE**

In this case, Defendant was indicted for the following counts: (1) the first degree murder of Sonchious Ferguson in perpetration of aggravated child abuse on or about June 13, 1997; (2) the aggravated child abuse of Sonchious Ferguson on or about June 13, 1997; (3) the aggravated child abuse of Sonchious Ferguson between May 1, 1997, and June 13, 1997; (4) the aggravated child abuse of Austin Ferguson between May 1, 1997, and June 13, 1997; (5) the child abuse of Tyler Ferguson between May 1, 1997, and June 13, 1997; and (6) the child neglect of Bradlee Ferguson between May 1, 1997, and June 13, 1997. During a pretrial hearing, Defendant moved to sever the trials for the charges involving Sonchious (counts 1–3) from the trials for the charges involving the

other children (counts 4–6). The State subsequently agreed in a second hearing to the severance of the trials for counts 5 and 6, and Defendant then moved to sever the trial for count 1 from the trials for counts 2–4. The trial court denied the motion to sever the trial for count 1 from the trials for counts 2–4. On appeal, Defendant challenges the trial court's failure to sever the trial for counts 1 and 2 from the trial for count 3 and the trial for count 4. Defendant does not challenge the failure to sever counts 1 and 2. Indeed, it appears that count 2 was charged as a lesser-included offense of count 1 rather than as a separate offense. However, in both her motion for new trial and amended motion for new trial, Defendant only complained of the trial court's failure to sever count 4 (the aggravated child abuse of Austin Ferguson) from the trial in counts 1 and 3. On direct appeal we are precluded from addressing any issues that are not also raised in the defendant's motion for a new trial. Tenn. R. App. P. 3(e); State v. Clinton, 754 S.W.2d 100, 103 (Tenn. Crim. Ap. 1988). Therefore, we can only review the issue of severance only as it applies to count 4 charging aggravated child abuse of Austin.

Severance of offenses is primarily governed by Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure, which provides:

> If two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others.

Tenn. R. Crim. P. 14(b)(1). A trial court's denial of a motion for severance under this rule will only be reversed when there has been an abuse of discretion. State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999).

The primary inquiry into whether a severance should have been granted under Rule 14(b)(1) is whether the evidence of one crime would be admissible in the trial of the other if the counts of the indictment had been severed. State v. Moore, 6 S.W.3d 235, 239 (Tenn. 1999). When the other offenses in a common scheme or plan are not relevant to a material issue, a severance should be granted in order to ensure that the defendant receives a fair trial because a failure to sever invites the jury to improperly infer that the defendant has a propensity to commit crimes. Id.

Because a motion to sever is typically a pretrial motion, evidence and argument tending to establish or negate the propriety of severance must be presented to the trial court in the hearing on the motion. State v. Spicer, 12 S.W.3d 438, 445 (Tenn. 2000). Further, appellate courts should look only to the evidence and argument presented at the hearing, along with the trial court's findings of fact and conclusions of law, when determining whether the trial court abused its discretion by refusing to grant a severance. Id.

Before a trial court may deny severance, the trial court must conclude from the evidence and argument presented at the pretrial hearing that:

(1) the multiple offenses constitute parts of a common scheme or plan, Tenn. R. Crim. P. 14(b)(1); (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses, Tenn. R. Evid. 404(b)(2); Moore, 6 S.W.3d at 239; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant, Tenn. R. Evid. 404(b)(3).

Spicer, 12 S.W.3d at 445.

The record indicates that the trial court found that the first degree murder of Sonchious during the perpetration of aggravated child abuse, the aggravated child abuse of Sonchious, and the aggravated child abuse of Austin were part of a common scheme or plan.

In Tennessee, there are three categories of common scheme or plan evidence: (1) offenses that reveal a distinctive design or are so familiar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction. Moore, 6 S.W.3d at 240. The State argued at one time or another during the two pretrial hearings that the three offenses at issue fit into all three categories of common scheme or plan evidence.

Before multiple offenses may be said to fit into the first category of common scheme or plan evidence, the modis operandi employed must be so unique and distinctive as to be like a signature in that the methods used have such unusual particularities that it is not likely the methods were employed by different persons. Shirley, 6 S.W.3d at 248. In this case, the State failed to introduce any evidence that the methods employed by Defendant in committing the three offenses at issue were the least bit unique. The State did not specifically identify the type of abuse that resulted in Sonchious' death, and although the State argued that the proof would show that both Sonchious and Austin had been beaten with a plastic rod, the State essentially conceded that the proof established that Austin was also beaten with a shoe. Quite simply, the State did not establish that all three crimes were committed by the same method and more importantly, there is nothing so unique or unusual about committing aggravated child abuse by using a rod or a shoe that would cause reasonable people to conclude that the same person committed all of the offenses.

The second, continuing plan category encompasses groups or sequences of crimes committed in order to achieve a common ultimate goal or purpose. State v. Hallock, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). The State argued during the pretrial hearings that the offenses were part of a continuing plan or conspiracy. Although the State argues on appeal that the offenses were part of a continuing plan to discipline the children, the State did not make that argument during the pretrial hearings. Instead, the State argued during the hearings that the similar abuse over a relatively short period of time demonstrated a pattern of abusive parenting. Regardless, the State failed to identify any evidence during the pretrial hearings that Defendant committed the offenses as part of a plan to discipline the children, or for any other plan or purpose. Quite simply, no evidence was identified during the pretrial hearings from which it could be concluded that the offenses were committed to achieve a common ultimate goal or purpose.

-12-

The third, same transaction category denotes crimes which occur within a single criminal episode. Id. The fact that offenses occurred within the same house and over much of the same period of time does not mean that they are part of the same transaction. Id. Although the State contended during one of the pretrial hearings that all of Defendant's children were beaten at least once during a single transaction, the State admitted during the other pretrial hearing that the proof could only establish that the children were abused during the same forty-eight hour period. Moreover, the State failed to identify any evidence that Sonchious and Austin were abused during a single criminal episode, rather than just during the same general time period. In fact, the State argued that the count for the first degree murder of Sonchious during the perpetration of aggravated child abuse and the count for the aggravated child abuse of Sonchious were separate offenses because they occurred at different times.

We conclude that the State presented no evidence during the pre-trial hearing that the offense regarding Austin Ferguson as the victim was part of a common scheme or plan, as that is defined by case law, with the offenses involving Sonchious Ferguson.

Because the three offenses were not part of a common plan or scheme, we hold that the trial court abused its discretion when it failed to sever the trials for all three of the offenses at issue in this case. However, that does not end our inquiry because a failure to sever may be harmless error. Spicer, 12 S.W.3d at 447. "The line between harmless and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard required to convict, beyond a reasonable doubt." Shirley, 6 S.W.3d at 250 (citation and internal quotations omitted).

Although the evidence in this case was legally sufficient to support all three of Defendant's convictions, the evidence was far from overwhelming. For instance, the State did not present any witness who was able to testify that he or she personally saw Defendant abuse the victims on any occasion. In addition, Dr. Toolsie testified that Sonchious had several injuries on his body that were consistent with a fall down some stairs and Dr. Toolsie testified that although it was not probable, it was possible that the internal abdominal injuries that caused Sonchious' death were inflicted when he fell against the edge of a stair. Dr. Breeden testified that several of Austin's injuries could have been caused by other children or by incidents such as being hit in the head with a baseball. Although the evidence was legally sufficient, the State's evidence was hardly unimpeachable. The error in failing to sever count 4 from the other counts, more probably than not, affected the verdict rendered by the jury. Therefore, the trial court's failure to sever was reversible error.

## IV. DENIAL OF MISTRIAL

Defendant contends that the trial court erred when it failed to grant a mistrial when the prosecutor elicited a hearsay statement that had previously been ruled inadmissible. We agree.

The record indicates that in August of 1997, Defendant filed a motion in limine in which she asked the trial court to rule that one of the paramedics who responded to the 911 call from her residence could not testify that when the paramedic asked Austin what happened to his head, Austin stated that his mommy did it. The record also indicates that the trial court subsequently filed an

order in which it ruled that neither Defendant nor the State could mention Austin's statement during voir dire and opening statements. The court also ruled that the paramedic was prohibited from repeating Austin's statement unless there was a subsequent jury out hearing during which the court found the statement to be admissible. The trial court subsequently ruled that Austin was incompetent to testify during trial.

During trial, Detective Long was recalled to testify for the defense and he was questioned about whether the shoe that allegedly caused the lesions on Austin's face had been tested for the presence of blood or skin. The prosecutor then cross-examined Long, and the following colloquy occurred:

| [Prosecutor]: | Now, [defense counsel] asked you about the playground and your discussions with Austin and what he said. What did he—who did he say did this to him? |
|---|---|
| [Long]: | He told me that his mother did it to him. |
| [Defense counsel]: | I'm going to object to that. |
| [Court]: | Sustained. |

Defense counsel then moved for a mistrial, and the prosecutor argued that a mistrial was not required because defense counsel had opened the door to admission of Austin's statement. Defense counsel denied opening the door to admission of the statement, and the trial court conducted a jury out hearing in which it asked the court reporter to play back the tape of the testimony in question. After listening to the testimony, the trial court found that defense counsel had done nothing whatsoever to open the door to Austin's statement.

At this point, the prosecutor argued again that defense counsel had opened the door to admission of Austin's statement. The following colloquy then occurred:

| [Court]: | Well, what he said was that he talked to somebody and they didn't see anything. That did not in any way open up anything about Austin, because the question was trying to say, "Was somebody else there that might have seen that they got hurt on the playground?" The answer was no, which precluded him from pursuing anything else about it being a playground thing. |
|---|---|
| [Prosecutor]: | Your Honor, he asked about the injuries to Austin— |
| [Court]: | General, we're here on a three-day trial and the State asks a question that's clearly, clearly inadmissible. Now what am I supposed to do? Can I cure that with an instruction? |
| [Prosecutor]: | Well— |
| [Court]: | Or are we going to mistrial and start over again? Now that's clearly the kind of question that— |
| [Prosecutor]: | (Brief Pause) Obviously you don't agree with me, Your Honor, but I think it's clear that— |

| [Court]: | I don't agree that you can get through this witness hearsay evidence on who hit or whether he . . . the defendant hit the person or not. |
| --- | --- |
| | . . . . |
| [Prosecutor]: | And then I very methodically, Your Honor— |
| [Court]: | You can't methodically get in inadmissible hearsay evidence. |
| [Prosecutor]: | But he had, if he— |
| [Court]: | He doesn't— |
| [Prosecutor]: | He has the right to object when I, I tell him, you know. I mean— |
| [Court]: | General, the State has an obligation when it's prosecuting a case to see that justice is done and that inadmissible evidence is not slipped in. |

Shortly thereafter, the jury returned and the trial court gave the following instruction:

Ladies and gentlemen, the Court at this time would instruct you that you are not to consider any hearsay evidence in your deliberations. Any statements made by this witness and attributed to someone else should be disregarded by you and not considered by you in any way during your deliberations, nor should any decision you make be based on any such testimony.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). This Court will not disturb that decision absent a finding of an abuse of discretion. Id. "Generally, a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). In determining whether there is a "manifest necessity" for a mistrial, no abstract formula should be mechanically applied and all circumstances should be taken into account. State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993) (citation omitted). "While Tennessee Courts do not apply any rigid test when examining the failure to grant a mistrial after a witness has given improper testimony, there are certain factors that are often considered: (1) whether the improper testimony was elicited by the State or whether it was a spontaneous declaration by the witness, (2) whether the case against the defendant was strong or weak, and (3) whether the trial court gave a prompt curative instruction." State v. William Dotson, No. 03C01-9803-CC-00105, 1999 WL 357327, at *4 Blount County (Tenn. Crim. App., Knoxville, June 4, 1999) (numerous citations omitted) no Rule 11 filed..

First, there can be absolutely no question that the prosecutor intentionally elicited the inadmissible testimony about Austin's statement. We have reviewed the record, and we agree with the trial court's ruling that defense counsel did absolutely nothing that can be interpreted as opening the door to the admission of Austin's statement. Instead, the prosecutor deliberately elicited testimony from Long that he knew had already been declared inadmissible by the trial court. The prosecutor attempted to place the blame for his actions on defense counsel's failure to object before Long was able to provide the inadmissible testimony. We agree with the trial court that the

-15-

prosecutor had an obligation to ensure that justice was served and as part of that obligation, the prosecutor had a duty to avoid violating a court order by introducing evidence that was "clearly, clearly inadmissible." The prosecutor's conduct, under these circumstances, was inexcusable.

Second, although the evidence in this case was sufficient to support the conviction for the aggravated child abuse of Austin, the evidence of Defendant's guilt was not overwhelming. As noted above, no witness testified that he or she ever saw the Defendant strike Austin and the State did not introduce any other direct evidence of guilt. Moreover, although Defendant admitted during her testimony at trial that she had spanked Sonchious with a plastic rod, she never admitted to striking Austin. Although there was sufficient circumstantial evidence to support the conviction for the aggravated child abuse of Austin, there was no direct evidence that Defendant committed the offense.

Third, we note that the trial court did give a curative instruction. However, we conclude that this factor is completely outweighed by the two factors mentioned above.

After taking all relevant circumstances into account, we conclude that the trial court abused its discretion when it failed to grant a mistrial in this case. There can be no question that Austin's hearsay statement that "mommy did it" was clearly prejudicial. In the absence of any direct evidence, the hearsay accusation was particularly damaging. The improper elicitation of the hearsay statement was especially prejudicial in light of the severance error discussed in Part III, supra. Not only did the hearsay statement have an obvious tendency to suggest that Defendant abused Austin, it also had the tendency to suggest that since Defendant abused Austin, she must also have abused and killed Sonchious. Under these circumstances, we hold that the prosecutor's intentional elicitation of improper testimony in violation of a prior court order created a manifest necessity for a mistrial in this case and the trial court's failure to declare a mistrial was reversible error. Considering the whole record in this case, not only did the error involve a substantial right, which more probably than not affected the judgment, it resulted in prejudice to the judicial process. Rule 36, Tenn. R. App. P.

## V. CONCLUSION

In conclusion, while the evidence was legally sufficient to support the Defendant's challenge, reversible error was committed when the trial court failed to sever count 4 from counts 1, 2, and 3, and when the trial court failed to grant the motion for a mistrial. The judgment of the trial court is therefore reversed and this case is remanded for a trial on counts 1, 2, and 3 and a separate trial on count 4.

_____
THOMAS T. WOODALL, JUDGE